Alexander Del Giorno, J.
In these claims there are two separate properties, one located east of, and the other located west of Roekaway Turnpike in the village of Inwood, Town of Hempstead, Nassau County. These properties were used by claimant Roekaway Peninsula Corporation for its operations as a discount house. The specific descriptions and operation of the properties are generally set out in the findings of fact submitted by the parties hereto and within this amended memorandum decision.
In this amended memorandum decision the court attempts to answer the many findings which have been marked “ Refused ” or “ Refused except as found ”, as well as set forth the many con *116 elusions arrived at by the court as a result of the testimony and the viewings of the properties.
The court will treat each property separately, starting with the property involved on the west side, the taking of which is described in Claim No. 38400.
The claim of Bargaintown, U. S. A. No. 2 Corp. is a fixtures claim which will be referred to at the end of this amended memorandum decision.
Claimant bought land on the west side of Bockaway Turnpike because it needed to expand as its business was booming. It is obvious that it would promptly proceed to fill and bulkhead, else the land would be useless.
What was not done by the time of vesting was generally contracted for and, as a result, by May 12, 1961, the new building-consisting of an area of 160,000 square feet was completed and the entire frontage all black-topped, including most of the area taken by the State.
The proper evaluation for this land, consisting of 18.604 acres, must take into account the obvious. Admittedly, some 92,800 cubic yards of fill had been pumped into the land and the man-made canal which ran through the land; also, some fill had been placed thereon by Concord Oil Co., a neighbor and friend, as a favor to claimant, while claimant was awaiting a permit to pump sand from the bay from the Town of Hempstead. During this period of waiting for a permit, claimant also placed some 27,000 cubic yards of truck fill on the land and had erected, or contracted to erect, bulkheads to contain the filied-in land.
In awarding damages, the court disregards the paving done by the claimant, for the reason that it was done after the vesting date and may not be considered as contracted for, and because that portion of the paving which covers the State acquisition was a voluntary act on the part of the claimant which it performed for its own business advantage or necessity.
However, taking the land as we have done, we must also consider its location, the over-900-feet frontage on Bockaway Turnpike, one of the busiest highways between Queens and Nassau Counties, the use which its zoning permitted, the large area available for such use and for parking of cars so essential in a business of that type; also, its nearness and accessibility to many major highways on the south shore of Long Island, the scarcity of such large parcels and the large residential population nearby which also contributed to claimant’s business. As we have stated, we can more justly assign a value to the land on the date of vesting by keeping in mind these attributes.
*117 Mr. Wittman, the claimant’s appraiser, assigns $1.50 a square foot for 810,390 square feet of land within the bulkheads, or $1,215,585. Mr. Brons, the State’s appraiser, assigns 50 cents a square foot for 777,875 square feet, or $388,950. The court feels that the testimony and exhibits of the claimant are more persuasive than the State’s computation of the area of the land content within the bulkhead, and accepts them. Therefore, if we apply Mr. Brons’ square-foot value on the basis of 810,390 square feet, it actually would be $405,195 before the vesting.
It must be borne in mind that Mr. Brons stated that, in arriving at his value of 50 cents a square foot, he based his judgment on the raw land as of the time it was purchased by claimant. He did not consider fill, nor how much was required, when he inspected the land on May 27,1961. In his appraisal he states: “As of the date of appropriation, the appraiser had no knowledge of any fill or bulkheading as being installed by the owner.” Nevertheless, Mr. Brons testified that, upon inspection, he found that some 3 acres of the land taken was filled in, in addition to the claimant’s remainder of the land which he said he noticed was at grade at Rockaway Turnpike, from which it receded to a grade lower by 2 feet as it extended westerly.
Mr. Brons testified that if he had assumed the subject property to be on grade, he would have given it, in 1960, a value of $1 a square foot over-all, which involved his assumption that to the cost of the raw land he would add the cost of fill, etc., to arrive at said value.
The court, after hearing the many analyses of the comparable sales offered, the testimony of the various witnesses and a third viewing by it of the land and area surrounding it, concludes that the value of said land at the time of the vesting was $891,429, rounded to $891,500, allocating to it a square-foot value of $1.10.
The parties agree that the taking involved 235,850 square feet [5.414 acres]. The court agrees with claimant that the remainder, consisting of 574,540 square feet, is divided into two parcels. One parcel, which contained 7,252 square feet, ran along the southerly line of the portion taken and is landlocked. To this piece the court allocates a nominal value of $500, since the adjoining owner could add it to his holding and, in the opinion of the court, would gladly pay $500.
The remaining 567,288 square feet form the bulk of the usable land upon which now stands the large, modern, steel and brick discount building. A very excellent aerial photo is annexed to the first page of claimant’s appraisal. This photo delineates in green color the boundaries of the claimant’s lands on both sides *118 of Rockaway Turnpike and, in red and white lines, delineates the State’s taking.
This photo shows clearly how much of the State’s land was filled, as well as paved by the claimant, but it also shows the loss of nearly 700 feet of frontage. This photo may be studied in conjunction with claimant’s Exhibit 1, which is a location plan of the proposed Nassau Expressway and which shows that Ramp G, leading southeasterly from the proposed Expressway, by-passes the claimant’s remainder land to the benefit of Korvette, which adjoins claimant’s remainder on the southeast thereof, thus preventing the southbound traffic upon the Expressway from going into the claimant’s store, the business of which depends largely upon easy, direct approach by vehicle from the highway. The claimant will have the benefit of the 32-foot west service road which leads southward from Rockaway Turnpike, but which is one-way and can be compared only to a local street. For northbound traffic on the Expressway, ramp B may be used to descend to Rockaway Turnpike after which, by roundabout turns, one may go to claimant’s land. The claimant may not recover for circuity of access, but this element is brought out here to indicate what are the probable future travails of this claimant.
Inasmuch as the Expressway is expected to be some 20 feet high where it crosses Rockaway Turnpike, it must be assumed and, as a matter of fact, it was testified, that embankments will be erected. To what extent these will adversely affect the remainder is now a mere conjecture. Certainly, embankments do not help this kind of an operation. The 250± feet remaining on Rockaway Turnpike may permit two driveways, one for entry and the other for exit, but it will concentrate traffic in one area, just where traffic about to enter the west service road will start moving to its right with, no doubt, attendant traffic difficulties and confusion.
Moreover, the parking space is now some 40% less than before and that affects the claimant adversely for, unless parking space is available and access and entry are reasonable, the type of customer who shops on a highway will not be patient and wait. He will go on.
Inasmuch as the Expressway is not built and the claimant uses all the land it had before the vesting by paying the State a rental, we can only guess at the adverse effect the taking will finally have on the claimant. However, experience teaches that the negative factors enumerated above by the court will be there. For the reasons given, the court is of the opinion that the claimant has sustained severe consequential damages and *119 that its remainder is worth the sum of $453,830.40, rounded to $453,800, for which the court allocated a value of 80 cents a square foot.
The court finds the damage sustained by Bockaway Peninsula Corporation, Claim No. 38400, was in the amount of $437,200, of which direct was $259,435 and consequential $177,765.
The claimant is entitled to a judgment for the above amount.
With reference to Claim No. 39996, involving the land on the east side of Bockaway Turnpike, the court finds that there were no standard lessees here, only four concessionaires. Therefore, it is quite difficult to follow the processes of rent income adopted by the claimant’s appraiser, when directly applied to this property in the light of these leases.
The record indicates that the claimant’s gross income increased from $2,016,254 in 1957 to $4,540,495 for the year 1960.
The claimant’s expert adopts the projected rent income to which he applies the Ellwood tables, consisting of a band of investment plus the ratio of cash over mortgages at a rate of return he felt it was prudent to invest. To arrive at his results, the claimant’s expert computed the net income of the property upon the basis of $1 a square foot net for buildings 1, 3 and 4 and $2 a square foot net for building 2. The court finds these net rentals are somewhat higher than justified by the evidence and type of buildings, but even more so by the fact that this is a discount house whereat profits are usually smaller than those of a business operating on a more normal markup over the wholesale price. Even though the subject itself is a very successful enterprise, it does not yet bear the stamp of stability attached to the more conservative type of successful business establishment.
For his part, the State’s appraiser concedes in his appraisal that a stable and more realistic appraisal would be to estimate the net income an owner might procure by just estimating the gross rental he might expect from the entire property and deducting the estimated annual expense. He estimated the gross rent at $57,294 and the annual expenses at $24,000, leaving a net annual rent, before interest and amortization, of $33,294 and then he applied the building residual technique which he developed by the use of the band of investment theory. With this the court could not agree, for in the adoption of this approach we would have a nonamortizing mortgage, which is not available in the market.
Either approach misses the real point at issue. The value here must consider the contribution being made by the improvements *120 on the basis of present and prospective income. In the court’s opinion, the net income should be capitalized by the use of the building residual technique plus the use of the present worth of $1 in accordance with the Inwood tables, which will be more specifically set forth hereafter.
The court, upon the testimony and its own experience, has determined to its satisfaction the probable net rent for which this property could have been rented.
The court believes that the land and buildings would fairly bring in to the claimant a net rent of $35,700, based upon a figure of 75 cents a square foot for 9,767 square feet contained in buildings 1, 3 and 4 or $7,500 (rounded) and $1.75 a square foot for 16,111 square feet in building 2 or $28,200 (rounded). Building 2 has a 24 foot by 125 foot open patio in front which the court does not consider rentable per se, but only an attractive asset for the renting of the building.
The record indicates that this claimant conducts a well-run and highly successful business. This business, however, up to now is without any tangible competition. It must be noted that this business is conducted in a complex of buildings which are inharmonious with each other, and have grown up according to need rather than according to definite planning. Even though claimant was doing a combined gross business (east and west side of Turnpike) by 1964 of some $20,000,000, it is my opinion that, with competition coming (Korvette is now building immediately south of the westerly area owned by the claimant, which is an indication that other competitive types of business will soon follow), and the physical changes which will occur, plus the inexorable demands of the public, as well as the necessity to keep on attracting the same public, these buildings after 15 years will be a “ drag ’ ’ and an underimprovement on the land, irrespective of their physical condition. For that reason I gave those buildings an economic value of just 15 years, for I believe that by the end of that period they must be replaced to bring in a fair and adequate income. For the above reasons the court does not agree with the experts regarding the usable life of the buildings.
To the land the court attributes a fair market value of $151,700 (rounded) on the basis of a unit value of $1.55± a square foot for 98,042 square feet.
Having thus established the value of the land on the basis of comparable sales and the court’s own viewings, we now employ the building residual technique to arrive at the value of the improvements which, as stated, the court believes will *121 bring out the value contributed by the improvements to the property.
The court is of the opinion that a .07 annual return on both the land and improvements is a fair return in this case. Therefore, we first arrive at a total net annual return on the land, deduct it from the total net income of $35,700, and the remainder represents the total net income attributable to the improvements. We make use then of the Inwood tables whereby we apply the proper coefficient factor that will indicate the present worth of $1 for 15 years, all of which is figured out below:
1. Net income before interest and recapture ............................. $35,700
2. Fair market value of the land — $151,-700
3. Estimated interest rate on the land — .07
4. Multiply No. 2 by No. 3 to find annual net income attributable to land...... 10,600
5. Subtract to find net annual income attributable to the improvements.. $25,100
6. Estimated recapture period —15 years
7. Estimated interest rate — .07
8. Applying No. 6 and No. 7 above, we determine that the present worth of $1 per annum, using the Inwood tables, produces the coefficient 9.108, which shall be adopted to determine the owner’s interest.
9. We now multiply the net rent attributable to the improvements by the factor, thus $25,100 X 9.108, to find value of the improvements, which totals... $228,600 (rounded)
10. We add the present value of the land.. 151,700
to the present value of the improvements (No. 9), which results in a total fair market value of land and improvements at the time of the appropriation of.................. $380,300
The court finds that the fair market value of the remainder (2,695 square feet), having a very limited use, is $2,500.
*122 The court finds that the claimant has been damaged as a result of the taking east of Rockaway Turnpike in the sum of $377,800.
With reference to the trade fixtures owned by the claimant Bargaintown, U. S. A. No. 2 Corp., it is to be noted that the claimant testified that their value at the date of the appropriation was $18,259, while the State testified that the said value was $14,344. The court finds that the fair value of the said fixtures was $16,000.
The court hereby awards to the claimant Rockaway Peninsula Corporation, in Claim No, 38400, the sum of $438,200, with interest thereon from January 19, 1960 to July 19, 1960 and from October 17,1960 to the date of entry of judgment.
The court hereby awards to the claimant Rockaway Peninsula Corporation, in Claim No. 39996, the sum of $377,800, with interest thereon from July 18,1961 to date of entry of judgment.
The court awards to the claimant Bargaintown, U. S. A. No. 2 Corp., in Claim No. 39996, the sum of $16,000 for the fixtures appropriated, with interest thereon from July 18, 1961 to date of entry of judgment.
The court has granted the fair value of all the buildings involved in Claim No. 39996 on the basis of the following reasoning:
During the year 1958, Rockaway Peninsula Corp. applied for a building permit for an additional building it planned to erect. The Building Department of the Town of Hempstead, finding the plans satisfactory, nevertheless refused to issue a building permit because the State Department of Public Works had instructed it not to issue a permit for the erection of any building on any property which might be within the proposed right of way of the Nassau Expressway.
Claimant was then referred to the Babylon office of the Department of Public Works. Mr. Groul, the District Engineer, refused to withdraw his ukase to the Building Department unless Mr. Dobin, the claimant’s president, would agree to sign a letter then and there prepared by Mr. Groul, which stated in part, “in consideration of the State entering no objection to the erection of corrugated metal building ’ ’ and ‘1 in consideration of (State) granting permission to construct * * * building ”, the claimant will make no claim for damages or reimbursement for building and fixtures.
Claimant signed the letter October 15, 1958. At the same time, Mr. Groul addressed a letter to the Building Department, which was attached to a copy of letter signed by claimant. This letter stated in part, “In view of this Agreement we have no *123 objection to a permit being issued, etc.” Claimant took the letter to the Building Department and promptly received the permit.
Likewise, five days before Christmas, 1958, a fire destroyed the claimant’s main building. The claimant rushed plans for a new building. The very same thing happened again. This involved a new cinder block building, 125 feet X 125 feet.
On January 27,1959, Mr. Gfoul drew the letter for the claimant to sign, and then gave him his affectionate benediction in the form of the letter addressed to the Building Department of Hempstead who, on the same day, approved the plans.
Now the State, in its findings, requests the court to approve of this malevolent practice of the Department of Public Works.
This court does not lightly excuse the claimant, for, as the court inquired at the trial, he could have proceeded with an article 78 proceeding or, perhaps, an injunctive proceeding, and having failed to do so, he normally would then suffer the consequences which he could have thus avoided.
However, as the court sees this situation, this should not have arisen at ail. The appropriation of this parcel took place June 17, 1960, a year and a half after the letter of January 27, 1959. The State, therefore (which to this date has not even started work on this project), had no legal authority, under an assumed color of right, to impose its weight upon the Building Department or this claimant. This practice has been too often exercised by the Department of Public Works, but it is wrong — it is a dog-in-the-manger attitude: “ What I haven’t got but expect to have you can’t have either.” It is capricious and in the end it may hurt or even ruin the claimant, but gain nothing for the State, except opprobrium and disrespect.
Were this kind of an attitude employed by an individual in a powerful position in society against one who is weaker, we would quickly call it “ a holdup ’ ’ and condemn the same. The State had no sanction of law to arrogate to itself the power to rule or ruin; its obligation to set a shining example of upright, always morally defensible dealings for its citizens was set aside for the satisfaction of demonstrating bureaucratic supremacy.
The conscience of the court has been sorely disturbed by these events, and it could not be additionally tortured by passing favorably on the State’s requests.
All motions upon which decision was reserved are granted or denied in accordance with this amended memorandum decision.