In the Matter of the CITY OF NEW YORK, Respondent, Relative to Acquiring Title to Real Property for a Project Known as College Point Industrial Park Urban Renewal Project II, Stage III. LEO MARINELLO et al., Appellants.

Second Department, July 21, 1980

## APPEARANCES OF COUNSEL

*Greco & Gottlieb (Michael J. Greco* and *Siff & Newman, P. C.,* of counsel), for Leo Marinello and others, appellants.

*Greco & Gottlieb (Michael J. Greco* and *Robert S. Gottlieb* of counsel), for Tully & Di Napoli, Inc., appellant.

*Allen G. Schwartz, Corporation Counsel (Isaac Salem* and *Morris Einhorn* of counsel), for respondent.

### OPINION OF THE COURT

COHALAN, J.

In this condemnation proceeding, the claimants[1] appeal from that portion of the second separate and partial final decree entered in the office of the Clerk of Queens County on December 1, 1978 which makes and contains an award for Damage Parcels Nos. 1, 2 and 5 through 15.

In the brief for claimants, they develop the issues of inadequacy of award, the date set for the fixation of the award, the issue of plottage, the discriminatory selectivity allegedly exhibited by the condemnor, and the denial of an increment for the property's double street frontage, all of which will be discussed, *infra.*

The decree should be modified by increasing the award for plottage from 5% to 10%, or from $187,795 to $375,590, for a new total of $4,131,490 and, as so modified, affirmed, with costs.

The subject property is in the College Point area of Queens County. The project is known as College Point Industrial Park Urban Renewal Project II, Stage III. It consists of approximately 15 acres (653,200 square feet). Actual title to the premises vested in the City of New York (city) on June 25, 1974.

The claimants Marinello and Saveth are or were the sole stockholders of Westboro Industries, Inc. (Westboro), the owner of the fee.

The property is generally flat. It comprises 13 contiguous damage parcels. It is located on the northerly side of 20th Avenue, about 500 feet west of the Whitestone Expressway in Queens County. It fronts on four streets, only two of which are open, the others being mapped as "paper" streets. The land, referred to as Golf City, is improved with, *inter alia,* a golf

---

1. By court order, the claimant for the damage parcels at issue was changed from Westboro Industries, Inc., to its individual stockholders, namely, Leo Marinello, Leonard Marinello and Saul Saveth. We shall use the names of this corporation and the individuals interchangeably. We further note that claimant Tully & Di Napoli, Inc., has appealed from so much of the same decree as awarded it nominal damages for Damage Parcel No. 19. That award should be affirmed (see *Matter of City of New York [Tully & Di Napoli],* 73 AD2d 932). This opinion concerns only claimants Marinello and Saveth (Westboro).

driving range, a "pro" shop, a small, one-story restaurant, two miniature golf courses and a baseball batting range.

The undisputed fact pattern reveals that in September, 1967, the City Planning Commission designated approximately 560 acres in the area as appropriate for urban renewal (see General Municipal Law, art 15, and especially § 504).

The city planned to acquire the 560-acre site (some of which it already owned) as an industrial park, thereby hoping to create thousands of blue collar jobs while generating tax dollars. Following approval of an initial phase development of some 60 acres of the site in 1969, the Board of Estimate, on September 16, 1971, approved Urban Renewal Plan II (URP) for second phase development. Claimants' parcel, together with numerous others, was included in this resolution for acquisition and redevelopment. On January 13, 1972, the Board of Estimate authorized acquisition of the parcels, in accordance with the URP. The actual municipal agency responsible for carrying out the plan and overseeing the development of the College Point area into the contemplated industrial park was the New York Public Development Corporation (PDC). Testifying on behalf of the PDC, Richard Bernstein, its executive director, described the PDC as a not-for-profit, quasi-public corporation, established to assist the city in the development of industrial parks and endowed with wide decision making powers as to which parcels would be taken and which excluded. The URP was, in fact, developed primarily by the PDC in co-operation with the city. Bernstein further stated that the plan provided a mechanism by which parcels designated for acquisition could be excluded from condemnation, where, *inter alia,* they could be satisfactorily redeveloped by their owners for uses in conformity with the plan. As formally proposed to the Board of Estimate in a document dated May 21, 1971, it was noted that it "is the intent of the City of New York to achieve maximum feasible private development and redevelopment." Such redevelopment was mutually beneficial since the city thereby would save the cost of a condemnation award while, at the same time, permitting the owners to retain possession of their real property. The May, 1971 proposal provided that to obtain exclusion of the property from city acquisition, an owner had to submit what was termed an "acceptable proposal" to PDC within three months of the soon-to-be effective date of the approval of the URP, i.e., September 16, 1971, together with evidence of financial ability

to carry out the plan. PDC was to review each submission, and if satisfied as to conformity with the plan (as well as the applicant's ability to implement it), could recommend to the city that the parcel be temporarily or permanently excluded from condemnation. With respect to the Golf City parcel, Westboro strongly desired that the parcel be excluded from the taking and accordingly sought a satisfactory redevelopment proposal because its then recreational use was incompatible with the plan. After several tentative submissions, Westboro proposed a multilevel development encompassing the subject site's 15 acres (plus the anticipated acquisition from the city of 11 contiguous acres), providing industrial use of the first level, commercial use on the second and a restaurant and golf driving. range on the roof. The proposal was submitted in a letter of intent dated September 9, 1971, from Westboro to the PDC and incorporated the terms requested by the *PDC;* specifically, the letter included the following paragraph: "It is further understood and agreed that appropriate provision will be made upon approval of the sales transaction to us and have binding guarantees to provide for our completion of the project. We further agree to the adoption of the request by the City of the condemnation award of the land and for any present improvement existing as of the date of such condemnation to be based upon the value as of January 1, 1972 if, in the event in the future our project would fail and the City would be required to condemn our parcel for other land redevelopment use in the College Point Industrial Park. Any subsequent improvement with respect to our proposed project is to be valued as of date of condemnation. We agree to this method because we are convinced we are able to build, and develop to completion, our project concept."

While Westboro recognized that the proposal "does not in any way bind the City of New York, and its agencies or the Board of Estimate, or PDC", the letter closed with a request that if "satisfactory to you, kindly indicate acceptance by signing the copy enclosed herewith and return to the undersigned." It is conceded by the parties that the letter was never signed by the PDC nor returned to Westboro. Bernstein testified that PDC's board of directors decided not to sign the letter or take further steps until Golf City provided evidence of available financing and marketability of the project. Nevertheless, as an indication of acceptance, the board of directors of the PDC did authorize the executive director to temporarily

exclude the Westboro parcel from the imminent condemnation of the land. The initial appropriation of the vast majority of parcels occurred on December 1, 1972 at which time Golf City (as well as 16 other parcels) was excluded. Golf City was notified of its "interim exclusion" in a letter from PDC dated October 12, 1972, the PDC noting that it took such action because "you [Westboro] agreed to accept a condemnation award based upon value as of January 1, 1972 in the event of failure of your project necessitating future condemnation". Addressing itself to Westboro's request for a signed "acceptance" of its September 9, 1971 letter of intent, the letter, signed by Bernstein, continued that Westboro's "re-development plan has not been submitted with sufficient definition for the City or our Board to make a realistic judgment. Thus the [PDC] and the City *have never been in a position to formally act upon or approve* your proposal of September 9, 1971" (emphasis added).

The PDC continued to assist Golf City in the latter's efforts to bring the proposal to fruition. As one specific instance, it attempted to strengthen Golf City's position by introducing its principals to Peerage Properties, Inc., a company with a proven record for development and financing. Claimants, on their part, obtained the services of an architect to draw detailed plans and specifications of the proposed Golf City development, and thereby expended money as a consequence. There was no question that both sides acted in good faith throughout; nor is there any question that PDC relied on the clause in the September 9, 1971 letter that in the event of ultimate condemnation January 1, 1972 would be recognized as the award of payments date.

In this regard, it is significant that between September 9, 1971 and October 12, 1972, nothing appears in the record to indicate Westboro's repudiation or disavowal of January 1, 1972 as the award date if condemnation occurred. On the October date, PDC (by Bernstein) wrote to Saveth (chairman of the board of Westboro) relative to Golf City. The letter included the following paragraphs:

"For the record, our office was pleased to play the role of 'honest broker' to introduce Peerage to you in an attempt to possibly strengthen your preliminary proposals for re-development of your parcel by way of joint venture. * * *

"To date we have recommended exclusion of your property in order to give you every reasonable opportunity to refine

and implement your plans in accordance with the Urban Renewal Plan. We have recommended such interim exclusion since you agreed to accept a condemnation award based upon value as of January 1, 1972 in the event of failure of your project necessitating future condemnation by the City."

Not until December 29, 1972, did Westboro respond in writing to the PDC letter of October 12 of that year. It was signed by Saveth and stated, in pertinent part:

"In reviewing your letter of October 12, 1972, I wish to thank you for playing the roll [sic] of honest broker, and I trust that it works out favorably. However, we still have firm intentions of proceeding with the Golf City re-development plan under any circumstances. I have instructed my architect, Mr. Joseph Trapani, to proceed with preliminary borings, based on Study #6, which was the last submission to your office.

"If it is not putting the cart before the horse, we are willing to go to contract on the additional land we require, at your convenience. We fully intend to do this deal and be assured that we will satisfy your people as to the financial responsibilities and the ability to perform."

There was other correspondence between the parties relative to the Golf City development, but none of the letters made any mention of the award value date. Finally, on January 28, 1974, Westboro (by Saveth) threw in the towel, and in a one-paragraph letter addressed to PDC stated: "As per meeting at your office last week, we hereby confirm that you proceed with the condemnation of our property located in the College Point Industrial Park."

The very next day, January 29, 1974, Saveth wrote a three-paragraph letter to PDC, the final two of which read:

"It now appears that it would be economically unfeasible to satisfy the requirements of your department and our own goals for the development of this property.

"Therefore, although we do not welcome it, we will not oppose the condemnation of the above property, retaining whatever rights we have to obtain just compensation for same."

A third letter[2] on the subject, dated January 30, 1974, was addressed to PDC by Saul Saveth. The second paragraph (of

---

2. The three letters were written at the request of PDC, the second and third constituting amplifications of the first.

two) contained the intelligence that: "It now appears that it would be economically unfeasible to enter into such a redevelopment project on our own account since one of our principals has had a change in his personal situation."

The necessary legal proceedings then followed, culminating in the actual title vesting date of June 25, 1974.

It was not until the condemnation hearings and the post-hearing submission of briefs that the claimants attempted to repudiate the assurance in the September 9, 1971 letter that January 1, 1972 would mark the valuation date.

■ Claimants' position is that there was no binding contract between the parties, that there never was a meeting of the minds, and that there was no acceptance by the city because it had failed to sign and return the September 9, 1971 letter. Special Term held there was a unilateral contract because PDC by excluding Golf City from condemnation (at least temporarily) caused the contract to reach fruition. As Special Term further pointed out, the temporary forbearance to condemn and the waiver by Westboro was sufficient consideration for a binding contract (see *Jemzura v Jemzura,* 36 NY2d 496, 504; *Ryerson & Son v A. V. O'Donnell, Inc.,* 279 NY 109, 115; *Muir v Greene,* 191 NY 201, 204; *Strong v Sheffield,* 144 NY 392, 394-395; *Hamer v Sidway,* 124 NY 538, 545).

■ There is nothing arcane or recondite about a waiver. It is defined as "a voluntary and intentional relinquishment or abandonment of a known existing legal right, advantage, benefit, claim, or privilege, which except for such waiver the party would have enjoyed" (21 NY Jur, Estoppel, Ratification and Waiver, § 88, p 126). So long as it is not unconstitutional or violative of public policy, it will be enforced.

There is no prohibition against waiver in either the former Condemnation Law, which was in effect when the proceedings herein were commenced, or in the Eminent Domain Procedure Law (L 1977, ch 839, eff July 1, 1978).

At bar, there is no suggestion in the record that Saveth, as a 50% stockholder of Westboro and chairman of its board of directors, did not know what he was doing when he signed the September 9, 1971 letter. Indeed, in response to the court's direct questions if he knew what he was doing when he signed the various papers, Saveth answered in the affirmative.

Waiver has been invoked on countless occasions and in many and varied phases of the law.

As examples, we know that in criminal proceedings by statute (CPL 320.10, subd 1) one may waive trial by jury; or to be present as a defendant at a trial *(People v Epps,* 37 NY2d 343).

In the field of education, it was recently held that tenure may be waived *(Matter of Abramovich v Board of Educ.,* 46 NY2d 450, cert den 444 US 845), so long as it is done intelligently and voluntarily (see, also, *Matter of Feinerman v Board of Coop. Educational Servs. of Nassau County,* 48 NY2d 491). *Matter of Meachem v New York Cent. R. R. Co.* (8 NY2d 293) is authority for waiver in a workers' compensation matter. In contract actions, the doctrine of waiver has been applied *(Davison v Klaess,* 280 NY 252). Waivers are customarily employed in proceedings in Surrogate's Court *(Matter of Kellas,* 40 NYS2d 655, affd 267 App Div 924, affd 293 NY 908), and so on through the gamut of legal actions and equitable proceedings.

Research has failed to uncover any reported cases of a similar nature on waiver in condemnation proceedings in New York State except *Rockaway Peninsula Corp. v State of New York* (47 Misc 2d 114, mod 29 AD2d 997) which we do not find to be applicable to the factual situation at bar. There, the authorities "permitted" the claimant to build on a paper street in consideration of waiving an award for the value of any improvements placed thereon. The claimant could have obtained in a CPLR article 78 proceeding what it claims it was forced to agree to. At bar, the action of PDC was an act of grace. It extended to Westboro the opportunity to prove that it could make a go of its recreational facilities and deferred any question of condemnation to give it that chance. Further, PDC agreed to and honored the clause in the Westboro letter of September 9, 1971 that "[a]ny subsequent improvement with respect to our proposed project is to be valued as of date of condemnation."[3]

Moreover, the court has had its attention called to a number of cases in the Federal jurisdiction wherein the question of just compensation "has been agreed on" in contract matters. Thus, as noted in one of them, *Albrecht v United States* (329 US 599, 603): "The Fifth Amendment does not prohibit landowners and the Government from agreeing between them-

---

3. Claimants settled their claims for fixtures and improvements for $850,000, aside and apart from the land value award of approximately $3,950,000.

selves as to what is just compensation for property taken. See *Danforth v. United States,* 308 U. S. 271. Nor does it bar them from embodying that agreement as a contract, as was done here. And certainly where a party to such a contract stands upon its terms to enforce them for his own advantage, he cannot at the same time successfully disavow those terms so far as he conceives them to be to his disadvantage."

Applying that statement to the instant case, can anyone seriously argue that PDC would have granted a carte blanche permanent deferment to Westboro without receiving a *quid pro quo* relative to the award date for the parcel if condemnation became necessary? We think not. Further on this point, we note that "[t]here is no doubt that an owner of land taken by eminent domain may waive his right to compensation or damages, or be estopped to make such claim" (see 3 Nichols, Eminent Domain [rev 3d ed], § 8.82; *Matter of City of New York [Northern Blvd.],* 258 NY 136, modfg 232 App Div 830). In *Northern Blvd.* (p 155) the court noted, by CARDOZO, Ch. J., that: "[T]he grantee was under a duty to convey the damage parcel to the city without compensation if required for the boulevard."

Logically, it would follow that if an owner may waive all consideration or be estopped from making any claim to it, he may waive or be estopped from making any claim for a portion thereof. New York Jurisprudence notes (vol 21, Estoppel, Ratification, and Waiver, § 91, p 128) that: "A party may waive a rule of law or a statute, or even a constitutional provision enacted for his benefit or protection, where it is exclusively a matter of private right, and where no considerations of public policy or morals are involved" (see *Selzer v Baker,* 295 NY 145; *Rosen v New York City Teachers' Retirement Bd.,* 282 App Div 216, affd 306 NY 625). On this point we hold, therefore, that the instant case is one involving solely a "matter of private right" with "no considerations of public policy * * * involved".

We turn our attention now to the argument of the claimants that the PDC's allegedly discriminatory treatment of them by imposing a so-called arbitrary condition, namely that they accept a valuation date for their property other than the title vesting date of June 25, 1974, was a denial of equal protection and therefore against public policy.

It will be recalled that Bernstein testified for the PDC as to parcels excluded from immediate condemnation. As to parcels

other than Golf City that were excluded, he stated: "There was nothing at all of their scope of magnitude, your Honor." On a later date, he testified as to 17 parcels that had been excluded initially from condemnation and explained the rationale of exclusion for each. A list of the 17 parcels is in evidence.

As to the first seven, he noted that they were small parcels along an open street and were already being devoted to industrial use or committed to that purpose. They were not condemned for that reason. Five other parcels already conformed to the URP but by error had been designated for acquisition because of inadequate information furnished as to their ownership and use. The final five included Westboro and did not conform to the URP.

In each instance, Bernstein gave a cogent reason for inclusion or exclusion and pointed out that they were condemned—if condemned—no later than June 25, 1974.

As to why the others were not asked to agree to the valuation award date of January 1, 1972, as was Westboro—or, if asked, did not comply—Bernstein testified as above noted, that none of them was of the "scope of magnitude" of Golf City. A fair inference is that the others were nowhere near the money value of Westboro's holdings.

Thus, we find that no discriminatory treatment was practiced on the claimants and that the fixing of January 1, 1972 as the award date for Golf City was not arbitrary.

On the issue of plottage, we agree with claimants that they are entitled to a 10% rather than a 5% increment figure.

In Black's Law Dictionary (4th ed, p 1314), plottage is defined as: "A term used in appraising land values and particularly in eminent domain proceedings, to designate the additional value given to city lots by the fact that they are contiguous, which enables the owner to utilize them as large blocks of land" (citing *Matter of Erlanger v New York Theatre Co.,* 206 App Div 148; and *People ex rel. Loeser & Co. v Goldfogle,* 220 App Div 326, affd as to plottage 249 NY 284). On the facts before us, and in view of the city's concession of a 10% plottage increment, we have increased the award accordingly. We do not agree, as reasoned by Special Term, that the size of Golf City had reached the area of maximum utility at which point the law of diminishing returns would set in.

The final arrow in claimants' quiver of arguments concerns

itself with "the customary increment for their property's double street frontage". We adopt the reasoning of Special Term in finding that such double frontage as exists is insignificant in nature and does not add to the value of the subject property.

The decree should be modified accordingly.

LAZER, J. P., MANGANO and O'CONNOR, JJ., concur.

Second separate and partial final decree of the Supreme Court, Queens County, entered December 1, 1978, modified, on the law, by increasing the amount awarded claimants Marinello and Saveth for plottage from 5% to 10% (or from $187,795 to $375,590) and the total award to $4,131,490. As so modified, said decree affirmed insofar as appealed from, with costs to appellants Marinello and Saveth payable by the city.