Milton Axpekt, J.
These claims arise from the appropriation by the State of Hew York of land pursuant to section 30 of the Highway Law. The appropriation proceeding is described as Interstate Boute Connection 541-1-3 (Everett Boad Extension), Albany County, Map Ho. 277, Parcel Ho. 314.
The aforesaid map and description were filed in the office of the County Clerk of Albany County on the 23d day of December, 1963.
*391 Claim No. 44592 was filed with the Clerk of the Court of Claims and the Attorney-General on the 20th day of November, 1964 and has not been assigned or submitted to any other court or tribunal for audit or determination.
Claim No. 51849, filed with the Clerk of the Court of Claims and the Attorney-General on December 4, 1969, was timely because no personal service of the taking map had been effected upon the corporation. The claim of the corporation has not been assigned or submitted to any other court or tribunal for audit or determination.
The court adopts the description of the appropriated property as shown on the map and description filed in the Albany County Clerk’s office, a copy of which is attached to Claim No. 44592 and same is incorporated herein by reference.
Trial of Claim No. 44592 commenced in October, 1967 before the late Paul C. Reuss, a Judge of the Court of Claims. During the trial of the claim, a question arose as to the interest of the four claimants in the property. The trial was recessed and, before it was scheduled for continuation, the untimely death of Judge Reuss occurred. Upon stipulation of the parties permitting the matter to be submitted for further trial and determination and decision to any Judge of the Court of Claims, the Presiding Judge of the Court of Claims ordered the claim to be determined by Judge Milton Alpeet.
Upon the trial, one of the claimants, Henry Koblintz Esq., testified that in the early part of 1962 the four claimants in Claim No. 44592, became interested in purchasing stock in a corporation which had entered into a lease to construct a building to house bowling alleys on land which the sole stockholder of the corporation and members of his family owned. Their interest took the form of negotiations with one, Sanford Sheber, who was the president and sole stockholder of the S & J Construction Corp. (hereinafter referred to as “Corporation”), and who, with members of his family, owned land part of which later was taken by the State in the instant appropriation. The Corporation had entered into a lease with a national bowling equipment manufacturer where the Corporation undertook to build on the above-described land a building to house bowling alleys and related equipment and facilities for operation by such manufacturer or its assigns as a bowling alley establishment.
It was agreed that the four claimants would purchase the stock of the Corporation, that the land would be conveyed to the Corporation, and that consideration to be paid to Sheber would be $80,000. Accordingly, on April 30, 1962, deeds were drawn *392 conveying the property to the Corporation. [The conveyance was accomplished by means of three deeds — actually recorded on May 7,1962 — two from Sanford Sheber and one from Barney and 'Clara Sheber.]
The four claimants agreed among themselves that claimant Beltrone would have a 50% interest; claimant Koblintz, 25%; and, claimants Fisher and Santandrea, 12%% each. In early May of 1962, the closing of the purchase of the Corporation took place. At that time, there were three outstanding shares of capital stock in the Corporation, all of which were held by Sheber. A single assignment in blank of such shares was executed by Sheber and handed over at the closing together with the shares themselves, the corporate books and. the three above-described deeds. (It was not necessary to do anything about the lease because it was between the Corporation and the bowling equipment manufacturer.) It appears that at about this time Sheber’s blank assignment of the three shares of stock was filled in by assigning such shares to “ Treasury ” because they could not be assigned conveniently to reflect the 50%, 25%, 12%%, and 12%% interests of the four claimants and because it was their intention to issue shares of stock in proper share-amounts to evidence such percentage holdings in the Corporation. The $80,000 consideration was paid as follows:
1. $1,000 by Beltrone early in 1962 as a deposit.
2. At the closing:
a. Beltrone .. $25,250.00
b. Koblintz .. 13,125.00
c. Fisher 6.562.50
d. Santandrea 6.562.50
$51,500.00
3. The $27,500 security deposit due under the lease was paid by the lessee to Sheber sometime within the next several months.
After the closing a corporate meeting was held by the new stockholders and new directors and officers were elected. The new stockholders of the Corporation, through such elected directors and officers, actively continued the operation of the Corporation. In the period that followed and during the construction of the building, such officers and directors, on behalf of the Corporation, negotiated a bank loan and executed mortgage documents.
*393 On December 1, 1962, claimant Salvatore Beltrone, as president of the Corporation, executed and delivered a deed conveying the property from the Corporation to claimants Beltrone, Koblintz, Fisher and Santandrea as copartners with the same percentage interests as in the Corporation.
At the time of the trial before the late Judge Rettss, the defendant raised the question of whether the four claimants were the proper parties in interest to make Claim No. 44592 in view of the filling in of the stock to “ Treasury ”, claiming no valid election of officers occurred and that accordingly, the December 1962 deed to the four copartners had no validity.
This court finds that it was the intention of the four claimants to be the owners of the stock in the Corporation in the stated proportions, and that all their actions, including payment of consideration to Sheber, evidenced this intention. It is clear that the four claimants retained beneficial interests in the stock of the Corporation and that they reserved their rights thereto even though the blank assignment of the three shares received from Sheber was marked “ Treasury ” and even though shares in proper denominations were not then immediately issued to the four claimants. It is obvious that Sheber no longer owned the stock and that the four claimants purchased and paid for it in their agreed upon percentages. The court finds that physical issuance and possession of certificates of stock were not essential to give effect to the beneficial interests, intentions and actions of the four claimants — that issuance and physical possession of stock certificates are evidences of ownership but that at least equitable, de facto ownership may and in fact did here exist in the absence thereof (Matter of Flagg-Utica Corp. v. Baselice, 14 Misc 2d 476; Matter of Leisner v. Pell City Estates, 62 Misc 2d 132). In December of 1969, certificates of stock were issued as originally contemplated and all the actions of the officers and directors theretofore-hadjwere ratified.
Accordingly, the court findsthatffhé four-claimants inClaim No. 44592 were, at the time of the State’s appropriation on December 23, 1963, the owners of the property by reason of the deed dated December 1, 1962 from the Corporation to Salvatore R. Beltrone, Henry H. Koblintz, Daniel Santandrea and G-ordon Fisher, grantees, recorded in the Albany County Clerk’s office on December 14, 1962 in Liber 1741 of Deeds at Page 161.
The court finds that the award herein should be made to the four claimants in Claim No. 44592 and it will, accordingly, do so. Claim No. 51849 was filed by reason of a possible interest *394 which the Corporation might have in the property appropriated in the event the court found that an award could not be made in Claim No. 44592. In view of the above, Claim No. 51849 can be and is hereby dismissed.
Before the appropriation, the property consisted of an irregularly shaped parcel on the westerly side of Watervliet Avenue in the City of Albany. It had 175± feet of frontage along Watervliet Avenue, and on the south was 712.91± feet deep.On the north, it had an irregular property line. Its first course on the north went westerly 220± feet from the street, then it went northwesterly for 150± feet, then continued 350± feet westerly to the rear of the property where the property was 270± feet wide. The parcel contained 3.820± acres and was generally level with a slight rise toward the west. On the northerly side, where the parcel abuts the former New York Central right of way (now the site of an installation of the Albany Traction Company), it drops down quite sharply to the lower level of such site.
At the time of the appropriation, claimants’ property was improved with a modern one-story 50-lane bowling alley building and supportive blacktopped parking areas. The building contained additional facilities in the form of a liquor bar, snack bar, equipment sales room, meeting room, locker rooms and utility rooms.
The appropriation was in the form of a rectangle, 80± feet wide and 712.91± feet in length which ran along the entire southerly portion of the parcel. The appropriation contained 1.302± acres and left a remainder of 2.518± acres. The appropriation was with access. No improvements were contained within the 1 ‘ take ’ ’ save some blacktopped parking area.
The claimants’ expert found a total before value for the property of $920,000 rounded, of which $83,202 was his value for the land calculated at 50 cents per square foot for the 166,404± square feet of the parcel, and $836,830 for the building and improvements. This included $460,000 for the alleys and pinsetters and $23,000 for liquor bar and snack bar equipment, which the court ruled to be personal property. His -after value he determined to be $847,500 rounded divided $46,617 for the 109,689 ± square feet of land remaining valued at 42% cents per square foot and $801,017 for the value of the building and its improvements, with the same $460,000 and $23,000 figures for the alleys, pinsetters, liquor and snack bar items noted above in his before value. His damage figure, therefore, he claimed he $72,500 of which $28,357 was for the direct appropriation 'r15± square feet of land valued at 50 cents per square *395 foot and consequential damage to the land and building of $44,040 based upon grade change, diminution to the remainder, obsolescence and loss of parking.
The State’s expert found a before value of $427,750 of which $45,763 was alloted to land value at 27.5 cents per square foot. To this he added $22,700 for blacktop and $900. for lights. His building value was $358,400. After the appropriation, he valued the remaining land at $30,167, the blacktop at $21,300, the lights at $900 and the building at the same value as before, $358,400. This resulted in a total after value of $410,800. Damages were calculated at $15,596 for the direct appropriation of 56,715± square feet at 27% cents per square foot and $1,400 for the blacktop taken. He rounded his direct damage to $17,000 and found no consequential damage.
A second expert testified on behalf of the State. His valuation was based on an income approach and he arrived at a $46,000 before valuation for the land and a $379,500 before valuation for the building and ground improvements. His before total was $425,500. Based on a $12,100 per acre land value, his direct damage for land was $15,754 and his damage for blacktop taken was $1,400. His total direct damage was $17,150 rounded. This he concluded was payable even though his after value on an income approach was the same as his before value. He, therefore, did not advance a consequential damage figure.
The court viewed the property after the construction work was completed, but was familiar with the property and its location before the State’s taking had occurred.
After careful consideration of the testimony at the trial, the appraisals and exhibits in evidence, the demeanor of the witnesses, and the court’s view of the subject property, the court finds as follows:—
1. The highest and best use of the property prior to the appropriation was for commercial use similar to that to which the subject property was being put — namely, bowling alley. The highest and best use after the appropriation was the same, except as diminished by the appropriation.
2. With respect to the before value of the land, the subject property was of better size and quality, had a better location and utility, had better access to Watervliet Avenue, and was not burdened with rights of way reserved to the grantor that characterized the State’s first appraiser’s Sales 79 and 80. Even though this appraiser adjusted these sales upward from 22 cents and 17± cents to 27.5 cents per square foot, respectively, the court has considered these upward adjustments and finds that they are insufficient. The court also has given consideration *396 to claimants’ appraiser’s Sales 1, 13 and 17 and notes that some six months after the State’s instant taking Sale 1 (which was not as good land) was for 36± cents per square foot, that Sale 13 (which was much better land) was for 55 cents per square foot, that Sale 17 (which was about 3% years earlier but of better land) was for 35± cents per square foot. The court, in addition, has considered claimants’ appraiser’s Sales 22, 23 and 24 which were of the subject property as part of the transaction for the $80,000 consideration described above in this decision. On the basis of $80,000, the square foot value would be about 48 cents. But, the court notes that a favorable lease and a corporate structure were included as part of the $80,000 consideration, that earlier sales of this land totaled $22,500, with two of the three sales occurring in 1961 and 1962 and that the land had to be cut and filled at an additional cost of some $14,000 to make it useful.
After careful consideration, the court finds that the State’s first appraiser’s Sales 79 and 80 should be further adjusted upward, that claimants’ appraiser’s Sale 13 should be adjusted downward, and that his Sales 1 and 17 approximately reflect the fair market value of the subject property at the time of the State’s taking — December 23, 1963 — at 35 cents per square foot. With respect to such Sale 17, the court balances off the earlier time and better land quality thereof against the later time of the State’s taking of the subject property (3%± years) and its lesser land quality — the increase in real estate values in the general area during such 3%± year period made up for the lower quality of the subject land.
Accordingly, based on the original 166,399 ± square feet, the before fair market value was $58,239.65; based on a remainder of 109,684± square feet, the after fair market value was $38,389.40; thus, the direct damage suffered by the claimants for the 56,715± square feet taken was $19,850.25 — which the court hereby rounds to $19,850 as the direct damage for the area taken.
The court arrived at the 35 cents per square foot fair market value of a whole-to whole basis for all of claimants ’ land before the State’s taking and rejects the claimants’ appraiser’s approach that the remaining land had a lesser value originally and that together with a consequential damage to the remaining land there was a total consequential damage in the sum of $8,227.
3. The court adopts the State’s first appraiser’s approach to valuation of damages resulting from the parking area surfacing which was taken — before fair market value $22,700; after fair
*397 market value $21,300; direct damage $1,400. The State’s second appraiser also arrived at this $1,400 direct damage figure.
4. The appraisers’ valuations of the building (exclusive of the personal property therein) were quite close:
Claimants’ appraisal, pages 21 and 26 — $347,393.
State’s first appraisal, pages 3 and 7 — $358,400. (The State’s second appraisal was for $379,500 for the building and land improvements — the first appraiser’s total on such basis was $382,000. Therefore, the second appraiser’s figure for the building alone was probably closer to the claimants’ appraiser’s figure.)
The difference between the claimants’ appraiser’s figure and the State’s first appraiser’s figure is explained essentially by the fact that the claimants’ appraiser ascribed a depreciation of $10,744 for the period of approximately one year between the time the building had been completed and the time of the State’s taking. The court regards this as more realistic and, accordingly, adopts the claimants’ appraiser’s $347,393 valuation as the fair market value of the building as of the date of the State’s instant taking on December 23, 1963.
5. " The court now arrives at the question of whether claimants are entitled to consequential damages resulting from the State’s taking. The State’s first appraiser allowed no consequential damages on the theory that claimants were not entitled to the same because they built with prior knowledge that the State had plans to take a strip off the southern side of their property and because there was no diminution of rental income from the lessee of the building. The State’s second appraiser relied on the latter ground and on benefit of the State’s improvement.
It is noted that the claimants completed their building plans and obtained their building permit in April of 1962 (— in which they placed their building so that it would not be on any of the area they were informed the State intended to take —), that they completed construction of their building by the fall of 1962, and that the State’s taking did not occur until December 23, 1963 — approximately 1 year and 8 months after claimants obtained their building permit and commenced construction work.
The court views this situation in this light — the claimants mitigated possible greater damages that would be payable by the State by placing their building so that no part of it would be in the area which the State contemplated taking. But, the court finds that the claimants did not proceed at their peril! Claimants could proceed to occupy and improve their property *398 so as to receive a financial return therefrom. Indeed, they could seek the best return they could achieve. Until the appropriation map was filed in the County Clerk’s office, the State could change its mind, eliminate, withdraw or abandon the project, change or alter the proposed location of the proposed improvement or add or take away easements and the like as it required. Until the map was filed, the claimant did not and could not definitely and finally know of the extent, type or conditions of the appropriation. Damages as the result of an appropriation are to be measured and fixed as of the time of taking (Wolfe v. State of New York, 22 N Y 2d 292; Mattydale Shopping Center v. State of New York, 303 N. Y. 974; cf. Rockaway Peninsula Corp. v. State of New York, 47 Misc 2d 114, 122,123, mod. on other grounds 29 A D 2d 997).
It appears to the court that while the claimants knew that the State had plans to take a strip from their property, they did not know of the proposed elevations of the new highway as it would pass by the southern side of their building — otherwise, they would not have oriented their building to the south, with the entrance there as the main entrance. Clearly, they seemed to be expecting at least to be able to have a half-moon driveway in front of the southern entrance with a separate ingress lane from the new highway east of the south entrance and a separate egress lane out onto the new highway west of the south entrance.
What actually occurred was that the elevation of the new highway gradually went higher as it went westerly vis-a-vis the building. Accordingly, while the southeasterly corner of the building is roughly at grade with the new highway at that point, the area of the south door is approximately two to three feet below the grade of the new highway and the southwesterly corner of the building is approximately a few feet lower. Thus, a half-moon driveway of the type described above does not appear to be feasible there. Instead, there is a paved area at grade with the southern entrance that goes nowhere — it dead ends west of the southern entrance and automobiles that drive in from the east and park there must back out. Also, the ample former parking area which is necessary for a bowling alley establishment has been seriously diminished by the State’s taking so that an unstable area north of the building had to be filled, graded and surfaced for parking and so that patrons who are unable to find parking spaces in the remaining parking area have to park on both sides of the new highway, on a parking lot of a nearby supermarket, and on Watervliet Avenue as much as several blocks away. Considering nighttime use of the alleys, the fear of some patrons to walk to these distant parking *399 areas at night, and the problems of walking to and from these outside areas during stormy weather, the State’s taking did have a detrimental effect. Furthermore, the court’s attention was directed to paragraph 12 of the lease which provides that in the event of condemnation of part of the property, the lessee is entitled to a reduction in rent or to a share of the award. Thus, the no-rent-reduction approach of the State’s appraisers is not based on a factually correct foundation.
The claimants’ appraiser at pages 26-a, 30, 32 and 32-a of his appraisal advanced his opinion that claimants were damaged in the amount of $35,813 as the result of “ additional functional depreciation attributed to change in grade [meaning — the grade of the new highway], relocation of parking lot, reduced parking area and deprivation of main entranceway.” This, the court notes, is approximately 10% of his building value before his first year’s depreciation. At the trial, this appraiser testified concerning loss of a total of 193 prime parking spaces in front of the building (its southern side), his so-called “ change in grade ”, the adverse effect on the value of the building because of these factors and its appearance of being below the grade of the new highway, and the lack of an automobile ingress and egress facility at the south door. Then, he broke down his $35,813 figure to $4,660 as a 10% reduction in the value of the land and $31,150 as attributable to the factors described immediately above.
The court, in the last paragraph of paragraph 2 above, rejected this appraiser’s $8,227 figure for damages on account of lower per square foot after value of the remaining land and now rejects the above $4,660 figure for the same reason. Accordingly, the court now views this appraiser’s remaining $31,150 consequential damage figure as within an approximately 10% of then building value approach. Considering the effects of the State’s taking, as described above, the court’s view that claimants are legally entitled to compensation for any consequential damages resulting from the State’s taking, that this appraisal with its consequential damage approach was prepared in 1964 which was before the adoption of this court’s rule 25a (22 NY CRB 1200.27) with its concomitant appraisal requirements, and that the trial was conducted on the basis of no prior exchange of appraisals as required by such rule 25a, the court finds that an approach of advancing a consequential damage figure within 10% of fair market value is an acceptable approach here. Actually, the claimants’ appraiser did attempt to show this in the form of before and after values. The court, on the basis of the appraisals, exhibits, testimony, view of the
*400 property, and the adverse factors described above, finds that the $31,150 figure represents the fair market value of the consequential damage to claimants’ building as the result of the State’s instant taking.
6. The court totals its award as follows:
Direct damage
a. Land taken........................ ..... $19,850
b. Parking lot surfacing taken......... ..... 1,400
$21,250
Consequential damage to building..... ..... $31,150
$52,400
At the end of the trial claimants moved to strike the appraisal of the State’s second appraiser which was based essentially on a capitalization of income approach. The court reserved decision on such motion. The court now denies such motion.
The claimant is awarded the sum of $52,400 for all damages direct and consequential, with interest thereon from December 23, 1963 to June 23, 1964 and from November 20, 1964 to the date of entry of judgment herein. However, interest shall not be paid:
1. From September 11, 1968 (on which date the late Judge Beuss suspended interest until the parties were ready to proceed before him) to March 12, 1969 (the date of the death of Judge Beuss) and
2. From June 3, 1969 (the date on which Presiding Judge Young issued his order directing that the claim be determined by Judge Milton Albert) to October 27, 1969 (the date on which continuation of the trial before Judge Albert was first scheduled to commence but when the trial could not then be continued because the defendant’s attorney was required to be engaged in another trial in Watertown).
The award to claimants herein is exclusive of the claims, if any, of persons other than owners of the appropriated property, their tenants, mortgagees and lienors having any right or interest in any stream, lake, drainage and irrigation ditch or channel, street, road, highway, or public or private right of way or the bed thereof within the limits of the appropriated property or contiguous thereto; and is exclusive also of claims, if any, for the value of or damage to easements and appurtenant facilities for the construction, operation and maintenance of publicly owned or public service electric, telephone, telegraph, pipe, water, sewer and railroad lines.
*401 This award does not include the value of a strip of land approximately 14 feet by 2 feet along the southerly side of Parcel 314 as shown on appropriation Map No. 277 which does not appear to be owned by claimant. This award is exclusive of the claims of all persons, firms and corporations for the appropriation of said strip of land other than that of the claimants herein, its mortgagees, lienors and tenants.