The UNITED STATES of
America, Plaintiff,

v.

MPM CONTRACTORS, INC., W.A. Michaelis, Michael P. McGill, Individually, and Asbestos Removal Contractors, Inc., Defendants.

Civ. A. No. 89–2371–0.

United States District Court,
D. Kansas.

April 18, 1991.

Janice M. Karlin, U.S. Atty.'s Office, Henry F. Rompage, U.S. E.P.A., Kansas City, Kan., Richard B. Stewart, Beverlee J. Destein, Environment and Natural Resources Div., U.S. Dept. of Justice, Clarence Featherson, U.S. E.P.A., Washington, D.C., for plaintiff.

John S. Seeber, Adams, Jones, Robinson & Malone, Gerald N. Capps, Jr., Richard D. Greene, Morris, Laing, Evans, Brock & Kennedy, Wichita, Kan., for W.A. Michaelis.

Frederick K. Starrett, Lathrop, Norquist & Miller, Overland Park, Kan., for Michael P. McGill and Asbestos Removal Contractors, Inc.

## MEMORANDUM AND ORDER

EARL E. O'CONNOR, Chief Judge.

This matter comes before the court on the motion of plaintiff United States of America for a preliminary injunction

against MPM Contractors, Inc. (hereinafter "MPM"), Asbestos Removal Contractors, Inc. (hereinafter "ARC"), and Michael P. McGill (hereinafter "McGill"), individually, pursuant to Rule 65(a) of the Federal Rules of Civil Procedure. The United States seeks to prohibit MPM, ARC, and McGill from disturbing the status quo and moving any assets beyond the jurisdiction of the court and the reach of plaintiff.

The court held an evidentiary hearing on the merits of the government's request on Friday, March 29, 1991. At the conclusion of the hearing, the court entered a temporary restraining order against defendant MPM until further notice, prohibiting MPM, its owners, directors, officers, employees, and anyone else acting for MPM from selling, transferring, encumbering, otherwise disposing of its assets, or doing anything to upset the status quo. For the reasons stated below, the court will grant the motion of the United States for a preliminary injunction against all of the defendants.

## FINDINGS OF FACT

1. Defendant MPM has been engaged in the business of asbestos removal since 1985. The company has been hired to remove asbestos from a variety of commercial projects: offices, schools, churches, and hospitals. MPM also works on demolition, renovation, and remodeling jobs. Connie McGill, the wife of defendant Michael P. McGill, owns all shares of stock in MPM, but she has not received any dividends. She is a homemaker. Her husband, the general manager of MPM, is the company's only remaining employee. His past duties as general manager included hiring the corporation's asbestos abatement workers, bidding for contracts, signing for loans on behalf of the company, endorsing MPM's checks, representing MPM before regulatory agencies, and signing the corporation's applications for licenses. His only function with MPM at this time is "selling off material assets of the company and collecting money owing to it."

2. The court held in its memorandum and order entered on October 2, 1990, that MPM violated the National Emissions Standards for Hazardous Air Pollutants (hereinafter "NESHAP") for asbestos, promulgated under sections 112 and 114 of the Clean Air Act, 42 U.S.C. §§ 7412 and 7414, while removing asbestos from Chandler Hall at Pittsburg State University, Pittsburg, Kansas, Quivera Junior High School in Holyrood, Kansas, and the Wolcott Building in Hutchinson, Kansas.

3. The United States seeks civil penalties for MPM's previous violations of the Act and injunctive relief to prohibit defendant from continuing to violate the NESHAP standards and the Clean Air Act. Any person who violates the Act is subject to a civil penalty not to exceed $25,000.00 per day for each violation. 42 U.S.C. § 7413(b). Defendant's seventeen daily violations of the Act, at $25,000 per violation, makes MPM liable for a maximum penalty of $425,000.00.

4. McGill provided information concerning MPM's financial condition to Dunn and Bradstreet (hereinafter "D & B"). A report compiled by D & B in 1989 indicated that MPM had $1,374,685 in sales, operating expenses of $117,803, $200,029 in costs for goods sold, a gross profit of $1,374,685, and retained earnings of $120,065. MPM's total assets as of October 10, 1990, were listed as $202,764. MPM contends its net worth was only $75,000 in August of 1990.

5. MPM and ARC designated McGill, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, as the person with knowledge of the financial condition of each company. McGill was deposed by the United States on February 20 and 21, 1991. At that time, he testified that a post office box was the only remaining asset of MPM. He added that MPM currently has "maybe $15,000 worth of potential receivables ... [p]robably $15,000 to maybe $25,000 in potential other equipment and materials ... [and] ... a little bit of cash in the bank ... [p]robably $5,000." MPM presently owes the State of Kansas $9,000.00 in fines, and ostensibly owes ARC $6,625.00.[1]

---

1. MPM was assessed a $9,000.00 fine for viola-

tions of the Kansas Asbestos Control Act, K.S.A.

These two debts gave MPM a negative balance of over $2,000.00.

6. McGill earns a base salary of $600 per week ($31,200/year) as the general manager of MPM. His base salary is generously supplemented by bonuses. The method in which MPM disburses bonuses to McGill is not in writing. McGill testified that he "could get paid more" when the company made more money. He received an income of approximately $142,000 in 1988. The next year, 1989, his income was approximately $108,000. His income from MPM dropped to $32,500 in 1990.

7. ARC was originally incorporated by Earl A. Steward, III (hereinafter "Steward"), a home builder, in June of 1990. Steward contracted through Envoy Business Brokers (hereinafter "Envoy") to purchase equipment and supplies from MPM for $100,000. The business assets were to be bought for $90,000 and $10,000 was to be paid for a noncomplete agreement with McGill. The signed Consulting and Referral Agreement has several initialed changes, but the first sentence of the agreement with the effective changes reads: "Earl A. Steward III and C. Kay Steward hereinafter referred to as 'Buyer' and *Michael P. McGill, Inc.* hereinafter referred to as 'Seller' have this date signed a purchase agreement." (emphasis added).

8. An unsigned draft Covenant Not to Compete Agreement dated June 26, 1990, between ARC and "Michael P. McGill, Connie L. McGill, and Mary L. McGill, hereinafter referred to as 'Covenantors'" stated:

WHEREAS, each Covenantor is either a director, officer or stockholder of MPM Contractors, Inc., a Kansas corporation

. . .

When deposed, McGill testified that while he was neither a director, officer, nor stockholder of MPM, "I think that the people involved in [the purchase of MPM assets] thought I was one or more of all of the above." The Sales Agreement was contingent upon Steward's ability to obtain financing. Steward failed to acquire the funding. The Sales Agreement was therefore canceled.

9. ARC's "major business activity" in Kansas is asbestos removal. The company also engages in interior finishes. McGill purchased every share of stock in ARC for a total of $1,750.00 on October 10, 1990. He receives a base salary of $600 per week from ARC. McGill has, on behalf of ARC, telephonically bid ten to twelve asbestos jobs, and visited two sites in order to bid asbestos jobs. Immediately after purchasing stock ownership of ARC, McGill transferred MPM's assets to ARC in exchange for $18,375. MPM, however, was not paid for the equipment and materials until December 24, 1990.

10. Defendant ARC's purchase included three vehicles from MPM which, as of February 21, 1991, had not been retitled in ARC's name, nor had the insurance on the vehicles been transferred from MPM to ARC. An appraiser hired by MPM, John R. Harris (hereinafter "Harris"), reported a fair market value of $18,278.00 for a checkwriter, refrigerator, microwave oven, and most of the other items sold by MPM to ARC.

11. McGill testified that "I had much influence in [selling MPM's assets and materials] because I was the manager of the company." Before the preliminary injunction hearing, this transaction appeared to include a transfer of virtually all MPM assets to ARC. A form supplementing MPM's license application states that "MPM has sold all its equipment to ARC and at this time is leasing equipment on a will call basis." McGill's deposition testimony indicates that a post office box was all that remained of MPM's assets. His testimony from the March 29 hearing reveals, however, that more MPM property has surfaced. The equipment of both corporations is housed at the same location—215 South Pattie Street, Wichita, Kansas.

65–5301 *et seq.* by the Shawnee County District Court. The fine was upheld by the Kansas Court of Appeals in *MPM Contractors, Inc. v. Dep't of Health and Env't,* —— Kan.App.2d ——, 788 P.2d 1344 (1990) (per curiam). On October 1, 1990, the United States Supreme Court denied MPM's writ of certiorari. *See MPM Contractors, Inc. v. Dep't of Health and Env't,* —— U.S. ——, 111 S.Ct. 146, 112 L.Ed.2d 112 (1990).

12. Very few corporate records were made of transactions between MPM and ARC. McGill testified that MPM failed to observe corporate formalities when he loaned $25,000 to ARC on December 24, 1990. There are no writings that document the terms of the loan. He states that $18,-375.00 of this money was paid to MPM for the assets taken two and one-half months earlier. The remaining $6,625.00 was a loan from ARC to MPM. As of March 29, MPM had not repaid the loan which was due on March 24, 1991.

13. McGill appears to have used the property of each company interchangeably to conduct his business affairs. He used a MPM check to pay for an ARC Kansas Department of Health and Environment (hereinafter "KDHE") notification filing fee for an asbestos removal job in Salina, Kansas, which had been contracted by MPM. He also sent correspondence on ARC stationary to the KDHE on behalf of MPM. MPM's telefax was also used by McGill to send a message on behalf of ARC to the same government agency.

14. MPM and ARC operated under the same type of license issued by the State of Kansas for asbestos removal. In fact, the same equipment, once owned by MPM but now held by ARC, was used to obtain both licenses. The two companies also enter bids to remove asbestos from the same type of buildings: schools, churches, and hospitals. MPM and ARC also share the same employees. The workers who removed asbestos for MPM have the same job functions with ARC. ARC and MPM submitted lists of the same asbestos workers with their bid notifications to the Kansas Department of Health and Environment. McGill himself is the general manager of MPM and appears to manage virtually all aspects of ARC's business. McGill testified at the hearing on March 29 that Erickson served as an estimator and supervisor for MPM and ARC. He also testified that Romula Pena and Kay Appleman were employed by both corporations.

## CONCLUSIONS OF LAW

1. Subject matter jurisdiction exists over this action pursuant to section 113(b) of the Clean Air Act, 42 U.S.C. § 7413(b). Section 113(b) provides that "the district court of the United States for the district in which the violation occurred or in which the defendant resides or has his principal place of business ... shall have jurisdiction to restrain such violation ..." 42 U.S.C. § 7413(b). Defendants MPM and ARC are corporations registered in the State of Kansas and, as such, are "persons" within the meaning of section 302(e) of the Act, 42 U.S.C. § 7602(e). Defendant McGill, in his capacity as an individual, is likewise a "person" within the meaning of section 302(e). In addition, the court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 because MPM's violation of the Clean Air Act raises a federal question.

2. Subject matter jurisdiction of this action also exists under 28 U.S.C. § 1345. Section 1345 provides district courts with subject matter jurisdiction over "all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress." 28 U.S.C. § 1345. The court also has jurisdiction over the subject matter of this action under 28 U.S.C. § 1355. Section 1355 provides district courts with subject matter jurisdiction "of any action or proceeding for the recovery or enforcement of any fine, penalty, or forfeiture ... incurred under any Act of Congress." 28 U.S.C. § 1355. All three of these defendants appeared at a hearing on this motion and failed to contest the court's jurisdiction.

3. Venue is proper pursuant to section 113(b) of the Act, 42 U.S.C. § 7413(b). Venue also exists under subsections (b) and (c) of 28 U.S.C. § 1391, as each violation occurred in the District of Kansas, McGill resides in the District of Kansas, and MPM and ARC are incorporated in the District of Kansas. Defendants MPM, ARC, and McGill did not challenge venue when they appeared for a hearing on plaintiff's motion.

■ 4. The purpose of issuing a preliminary injunction is to preserve status quo during the pendency of an action. *Lundg-*

*rin v. Claytor,* 619 F.2d 61, 63 (10th Cir. 1980); *Penn v. San Juan Hosp., Inc.,* 528 F.2d 1181, 1185 (10th Cir.1975). In order to be entitled to a preliminary injunction, a party must demonstrate: (a) the movant will suffer irreparable injury unless the injunction is issued; (b) the threatened injury to the movant outweighs whatever damages the proposed injunction may cause the party or parties to be enjoined; (c) the injunction, if issued, would not be adverse to the public interest; and (d) that there is a substantial likelihood that the movant will eventually prevail on the merits. *Tri–State Generation & Transmission Ass'n, Inc. v. Shoshine River Power, Inc.,* 805 F.2d 351, 355 (10th Cir.1986) (citing *Lundgrin v. Claytor,* 619 F.2d at 63), *appeal after remand,* 874 F.2d 1346 (10th Cir. 1989). Where a plaintiff demonstrates irreparable harm outweighing any potential harm to defendant, the probability of success requirement is satisfied when plaintiff raises questions going to the merits that are so serious, substantially difficult, and doubtful as to make them a fair ground for litigation. *Otero Sav. & Loan v. Fed. Reserve Bank,* 665 F.2d 275, 278 (10th Cir. 1981); *Wagner Elec. Corp. v. Thomas,* 612 F.Supp. 736, 741 (D.Kan.1985). For the reasons stated below, we find that plaintiff United States of America has met all of the foregoing criteria.

■ 5. It is well established in American jurisprudence that a corporation which purchases the assets of another corporation ordinarily does not assume the obligations of the transferror corporation. *West Texas Refining & Dev. Co. v. Comm'r of Internal Revenue,* 68 F.2d 77, 81 (10th Cir.1933); *Mank v. S. Kansas Stage Lines Co.,* 143 Kan. 642, 645, 56 P.2d 71, 73 (1936). There are, however, four well recognized exceptions to this general rule: (1) where the purchaser expressly or impliedly agrees to assume a liability; (2) where the transaction amounts to a consolidation or a merger of the corporations; (3) where the purchasing corporation is merely a continuation of the selling corporation; and (4) where the transactions are entered into fraudulently in order to escape liability. *R.J. Enstrom Corp. v. Interceptor Corp.,* 555 F.2d 277,

281 (10th Cir.1977); *Schmid v. Roehm GmbH,* 544 F.Supp. 272, 277 (D.Kan.1982); *see also Glass v. Pfeffer,* 849 F.2d 1261, 1267 (10th Cir.1988) (successor corporation liable for debts of transferor when successor is continuation of predecessor).

■ 6. In order for the court to find that a company is a successor corporation, substantial continuity must exist between the company and the selling corporation. *Fall River Dyeing and Finishing Corp. v. Nat'l Labor Relations Bd.,* 482 U.S. 27, 43, 107 S.Ct. 2225, 2236, 96 L.Ed.2d 22 (1987); *Coastal Derby Refining Co. v. Nat'l Labor Relations Bd.,* 915 F.2d 1448, 1452 (10th Cir.1990). Substantial continuity is primarily a question of fact and the trier of facts must look at the totality of the circumstances. *Fall River, supra,* 482 U.S. at 45, 107 S.Ct. at 2237; *see also Nat'l Labor Relations Bd. v. Daneker Clock Co., Inc.,* 516 F.2d 315, 316 (4th Cir.1975). In conducting the inquiry, a number of factors must be examined, including, most significantly: whether the business of both employers is essentially the same; whether the employees of the new company are doing the same jobs in the same working conditions under the same supervisor; and whether the new entity has the same production process, produces the same products, and basically has the same body of customers. *Coastal Derby Refining, supra,* 915 F.2d at 1452; *Nat'l Labor Relations Bd. v. Aquabrom, Div. of Great Lakes Chem.,* 855 F.2d 1174, 1178–79 (6th Cir.), *amended,* 862 F.2d 100 (6th Cir.1988); *Hawaii Carpenters v. Waiola Carpenter Shop, Inc.,* 823 F.2d 289, 293–94 (9th Cir. 1987).

7. In the case at bar, the business conducted by both MPM and ARC is essentially the same: asbestos removal. Indeed, the full name of defendant ARC identifies the type of business that it engages in— "Asbestos Removal Contractors, Inc." McGill stated in his deposition testimony that asbestos abatement was ARC's primary concern. Until February, when MPM's state license expired, MPM and ARC operated under the same type of license issued by the State of Kansas for

asbestos removal. In fact, the same equipment, once owned by MPM but now held by ARC, was used to obtain both licenses. The two companies also enter bids to remove asbestos from the same type of buildings: schools, churches, and hospitals.

8. ARC's employees are the former employees of MPM. The workers who removed asbestos for MPM have the same job functions at ARC. ARC and MPM have submitted lists of the same asbestos workers with their bid notifications to the Kansas Department of Health and Environment. McGill himself is the general manager of MPM and appears to manage virtually all aspects of ARC's business. McGill testified at the hearing on March 29 that Erickson served as an estimator and supervisor for MPM and ARC. He also testified that Pena and Appleman were employed by both corporations. Plaintiff has proven that ARC and MPM meet the continuity test set forth in *Fall River* and *Coastal Derby Refining*. It is clear that MPM and ARC merely provide a vehicle for McGill to carry on his business dealings. We have no trouble concluding that there is a substantial likelihood that the United States will prevail on the merits of its successor-in-liability claim.

9. A person is an officer or director de facto where he or she exercises the duties thereof under color of right, even where that person is ineligible to hold office because he or she owns no stock. 19 C.J.S. *Corporations* § 459 (1990); *see also State v. Miller*, 222 Kan. 405, 413–14, 565 P.2d 228, 235 (1977) ("de facto officer" is person who assumes and performs duty of office under color of authority and is recognized and accepted as rightful holder of office, despite his or her failure to conform to condition precedent); *Olathe Hosp. Found., Inc. v. Extendicare, Inc.*, 217 Kan. 546, 558–59, 539 P.2d 1, 12–13 (1975) (person who assumes and performs duty of office under color of authority and is recognized and accepted as rightful holder of office is "de facto officer," even though he or she failed to conform to condition precedent). A person who exercises plenary control over property for his or her own bene-

fit is the "de facto owner" of that property. *United States v. Parr*, 509 F.2d 1381, 1386 (5th Cir.1975). The question of whether an individual exercises de facto ownership depends upon the degree of "possession, control, dominion, or supervision." *Luterbach v. Mochon, Schutte, Hackworthy, Juerisson, Inc.*, 84 Wis.2d 1, 9, 267 N.W.2d 13, 16 (1978). In some cases, however, de facto ownership may exist in the absence of physical possession. *See, e.g., Beltrone v. State*, 313 N.Y.S.2d 238, 241, 63 Misc.2d 389, 393 (1970); *Leisner v. Pell City Estates, Inc.*, 307 N.Y.S.2d 293, 296, 62 Misc.2d 132, 134 (1970); *Flagg–Utica Corp. v. Baselice*, 178 N.Y.S.2d 860, 867–70, 14 Misc.2d 476, 482–86 (1958).

10. McGill testified in his deposition and at the hearing that he is the "general manager" of MPM Contractors, Inc. Several exhibits indicate that he signs documents for the corporation under the title of "general manager." McGill testified on March 29 that "I had much influence in [selling MPM's assets and materials] because I was the manager of the company." McGill is in fact identified in a No Compete Agreement as the seller of MPM. In his capacity as general manager, he hired the corporation's asbestos abatement workers, bid for contracts, signed for loans on behalf of the company, endorsed MPM's checks, apprised accountants of the corporation's financial status, represented MPM before regulatory agencies, and signed the corporation's applications for licenses. McGill also is paid bonuses in direct proportion to the company's profits.

11. All stock in MPM is now owned by Connie McGill, defendant's wife. She has never received a dividend from the stock. Mrs. McGill has not attended the two hearings held in this court involving MPM. There is no indication whatsoever that she has exercised any substantive control over the corporation. Further, the court is not aware of one instance in which Mrs. McGill, a homemaker, made a significant decision as to the affairs of the company. While defendant McGill is neither an owner of MPM stock nor office holder in the corporation, he appears to have complete control

over the company and its assets. He has performed the functions of an owner and officer. We conclude there is a substantial likelihood the United States will establish that defendant McGill's control over MPM and its assets is so complete as to constitute de facto ownership of MPM as a matter of law.

■■■■ 12. Under the alter ego doctrine, a corporate entity is disregarded and liability attaches to an individual who uses the corporation merely as an instrumentality to conduct his or her own business. *Quarles v. Fuqua Indus., Inc.*, 504 F.2d 1358, 1362 (10th Cir.1974); *Burge v. Frey*, 545 F.Supp. 1160, 1174 (D.Kan.1982); *Energy Reserves Group, Inc. v. Superior Oil Co.*, 460 F.Supp. 483, 506 (D.Kan.1978). Circumstances justify a disregard of the corporate entity if separation of the two entities has not been maintained and injustice would occur to third parties if the separate entity were recognized. *Quarles v. Fuqua Indus., Inc., supra*, 504 F.2d at 1362 (citing *Garden City Co. v. Burden*, 186 F.2d 651, 653 (10th Cir.1951)). A corporate entity can also be disregarded when it is used as a cloak or cover for fraud or illegality, *or* if necessary to achieve equity. *Luckett v. Bethlehem Steel Corp.*, 618 F.2d 1373, 1379 (10th Cir.1980); *Kilpatrick Bros., Inc. v. Poynter*, 205 Kan. 787, 796, 473 P.2d 33, 41–42 (1970). Each case involving disregard of a corporate entity must be decided upon its own special facts. *Serv. Iron Foundry, Inc. v. M.A. Bell Co.*, 2 Kan.App.2d 662, 670, 588 P.2d 463, 473 (1978).

■■■■ 13. Where the relationship between two corporations is so intimate and the assets of the two are so mingled that recognition of their distinct entity would result in injustice, courts will look through the legal fiction of separate entity and treat them as one corporation. *Milgo Elec. v. United Business Communications*, 623 F.2d 645, 662 (10th Cir.), *cert. denied*, 449 U.S. 1066, 101 S.Ct. 794, 66 L.Ed.2d 611 (1980); *Hoffman v. United Telecommunications, Inc.*, 575 F.Supp. 1463, 1478 (D.Kan.1983); *Int'l Union of United Auto. Workers v. Cardwell Mfg. Co.*, 416 F.Supp. 1267, 1286 (D.Kan.1976). An examination of Kansas law reveals that the following factors warrant consideration in determining whether two corporations should be treated as separate entities or the same: (a) undercapitalization of a one-person corporation; (b) failure to observe corporate formalities; (c) nonpayment of dividends; (d) siphoning of corporate funds by the dominant stockholder; (e) nonfunctioning of other officers or directors; (f) absence of corporate records; (g) use of the corporation as a facade for operations of the dominant stockholder or stockholders; and (h) the use of the corporate entity in promoting injustice *or* fraud. *Mackey v. Burke*, 751 F.2d 322, 326–27 (10th Cir. 1984); *Wilcox v. Precision Parachute Co.*, 685 F.Supp. 821, 824 (D.Kan.1988); *Amoco Chem. Corp. v. Bach*, 222 Kan. 589, 594, 567 P.2d 1337, 1341–42 (1977).

14. In the case at bar, McGill treats MPM and ARC as one company. He purchased every share of stock in ARC for a total of $1,750.00 on October 10, 1990. Immediately after he purchased stock ownership of ARC, McGill transferred MPM's assets to ARC. MPM, however, was not paid for the equipment and materials until December 24, 1990. Before the preliminary injunction hearing, this transaction appeared to include a transfer of virtually all MPM assets to ARC.[2] A form supple-

---

**2.** We find plaintiff's contention that defendants "fraudulently conveyed MPM's assets in order to hinder, prevent, or delay the United States from realization of any penalties assessed against MPM" persuasive. In the case at bar, a family relationship—husband and wife—exists between the grantor and grantee of MPM's assets. In addition, the transaction appears contrary to normal business practice, MPM receiving payment two and one-half months after ARC's alleged "purchase." Given the timing of this court's grant of plaintiff's motion for summary judgment, the United States Supreme Court's refusal to hear defendant MPM's appeal, and the purchase of substantial assets from MPM, the government's argument that the participation of MPM, ARC, and McGill in the transaction would impart these parties with knowledge of fraud is compelling. In light of the conflicting evidence as to the adequacy of consideration provided by ARC for MPM's assets, however, we decline to find at this time that the United States is likely to succeed on the merits of its fraud claim.

menting MPM's license application states that "MPM has sold all its equipment to ARC and at this time is leasing equipment on a will call basis." McGill's deposition testimony indicates that a post office box was all that remained of MPM's assets. His testimony from the March 29 hearing reveals, however, that more MPM property has surfaced. The equipment of both corporations is now housed at the same location.

15. In addition to the apparent transfer of assets at will between the two companies, McGill has failed to observe corporate formalities. On December 24, 1990, for example, he loaned $25,000 to ARC, but there are no writings that document the terms of the loan. He states that $18,-375.00 of this money was paid to MPM for the assets taken two and one-half months earlier. The remaining $6,625.00 was a loan from ARC to MPM. MPM had not, as of March 29, repaid the loan which was due on March 24, 1991. McGill testified that MPM has not been paying its bills.

16. Very few corporate records were made of the above transaction and others between MPM and ARC. Further, dividends were not paid to the owners of stock in the two companies. Corporate profits were paid in the form of bonuses to McGill. In addition, McGill wrote a MPM check to cover an ARC fee. He also used ARC and MPM stationary interchangeably when corresponding with the Kansas Department of Health and Environment. McGill testified that he used MPM's telefax to send a message on behalf of ARC to the same government agency. As noted above, MPM and ARC share the same employees. McGill, however, appears to be the only person from both companies that exercises any substantial decision-making authority. We are persuaded that sufficient evidence has been presented by plaintiff to establish that the United States has a substantial likelihood of prevailing under the alter ego doctrine.

17. In order to obtain a preliminary injunction, the moving party must show, inter alia, that "the movant will suffer irreparable injury unless the injunction issues."

United States v. Lawrence, 848 F.2d 1502, 1511 (10th Cir.) (quoting City of Chanute v. Kansas Gas & Elec. Co., 754 F.2d 310, 312 (10th Cir.1985)), cert. denied, 488 U.S. 980, 109 S.Ct. 528, 102 L.Ed.2d 560 (1988). The court found on March 8, 1991, that plaintiff was irreparably harmed by previous transfers of MPM assets and entered a temporary restraining order, prohibiting MPM or any person associated with MPM from transferring, selling, encumbering or otherwise disposing of any assets until the penalties hearing scheduled for March 22. On March 29, the court extended the temporary restraining order to the present.

18. MPM could be found liable for civil penalties exceeding $400,000.00. Defendant's ability to pay is one factor the court must consider in determining the amount of civil penalties. 42 U.S.C. § 7413(b). McGill testified that he has not made any arrangements to pay a fine imposed by the court. His recent transactions on behalf of MPM eliminate the possibility that the company could pay any meaningful fine imposed by the court. MPM presently owes the State of Kansas $9,000.00 in fines, and ostensibly owes ARC $6,625.00. These two debts gave MPM a negative balance in excess of $2,000.00. While some MPM assets apparently were not sold to ARC, there would be nothing to prevent MPM from turning over its remaining property to ARC if the court does not grant plaintiff's request for injunctive relief. We find that the United States "will suffer irreparable injury unless the injunction issues."

19. The third prerequisite of a preliminary injunction requires the moving party to offer "proof that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party." Equifax Serv., Inc. v. Hitz, 905 F.2d 1355, 1360 (10th Cir.1990); United States v. Enterprise Management Consultants, Inc., 883 F.2d 886, 888 (10th Cir. 1989). We have no difficulty concluding that the balance of harms in the instant action heavily weighs in favor of plaintiff. The United States asks only that defendants be prohibited from selling, transferring, encumbering or disposing of their assets until the court makes a final determi-

nation of civil penalties. Plaintiff does not request that the court prevent any of the defendants from engaging in business operations. On the contrary, the United States merely requests that the court secure the status quo and protect the interests of the government. If the defendants are permitted to transfer or dispose of their assets, the United States will suffer irreparable harm because it will not be able to collect on any award of civil penalties. There is no indication that defendants will suffer any *permanent* impact, but, rather, the assets will remain for MPM, ARC and McGill to do with as they please after the court makes a finding on the issue of penalties.

20. The final requirement that a movant must satisfy in order to obtain a preliminary injunction is a showing that the injunction, if issued, would not be adverse to the public interest. *Hartford House, Ltd. v. Hallmark Cards, Inc.*, 846 F.2d 1268, 1270 (10th Cir.), *cert. denied*, 488 U.S. 908, 109 S.Ct. 260, 102 L.Ed.2d 248 (1988); *Ewing v. Amoco Oil Co.*, 823 F.2d 1432, 1436 (10th Cir.1987). Numerous courts have recognized that removal of pollutants from the air which endanger the lives and health of the populace is a compelling public interest. *See, e.g., United States v. Wheeling–Pittsburgh Steel Corp.*, 866 F.2d 57, 60 (3d Cir.1988); *Nance v. Envtl. Protection Agency*, 645 F.2d 701, 716 (9th Cir.), *cert. denied*, 454 U.S. 1081, 102 S.Ct. 635, 70 L.Ed.2d 615 (1981); *United States v. City of Painesville, Ohio*, 644 F.2d 1186, 1193 (6th Cir.1980), *cert. denied*, 454 U.S. 894, 102 S.Ct. 392, 70 L.Ed.2d 209 (1981). In enacting the Clean Air Act, Congress made a determination that the public interest required substantial measures be taken to combat the deleterious effects of air pollution. *See* 42 U.S.C. § 7401.

21. There is no question that the use of the court's injunctive powers in the instant case would support the public interest. MPM is responsible for seventeen separate violations of the NESHAP asbestos standards. In Holyrood, Kansas, junior high school students were directly exposed to improperly maintained asbestos. MPM also failed to wet asbestos in Chandler Hall at Pittsburg State University and a large public building in downtown Hutchinson, Kansas. Even this lawsuit and an action filed by KDHE have not impressed upon defendant MPM the serious nature of asbestos and the proper work practices for removal of this material. A third suit has been filed against MPM alleging violations subsequent to the filing of this action.

22. The public can be assured of safe and healthy air through enforcement of the Clean Air Act and the NESHAP standards. Congress, when it passed this legislation, intended that the courts impose fines to punish violators of the Act. The public, therefore, has an interest in the court's ability to assess penalties against defendants. The court's capability of imposing penalties, however, is limited by the financial condition of the violator. MPM's financial condition has been significantly weakened by its transfer of assets to ARC in exchange for questionable consideration. The public's interest in imposing a penalty commensurate with the severity of defendant's violations would be preserved if defendants are prohibited from transferring any more assets, via McGill, to ARC or any other entity.

IT IS THEREFORE ORDERED that MPM, ARC, and McGill, their owners, directors, officers, employees, and anyone else acting on behalf of defendants are prohibited from selling, transferring, encumbering, or otherwise disposing of assets, moving assets beyond the jurisdiction of the court and the reach of plaintiff, or doing anything to upset the status quo until a final judgment is entered against defendants and plaintiff has collected any civil penalties imposed by the court.